Filed 7/16/15  P. v. Sanchez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WENSY SANCHEZ,<br><br>　　　Defendant and Appellant. | H040624<br>(Santa Cruz County<br>Super. Ct. No. F19538) |

Defendant Wensy Sanchez admits he stabbed his girlfriend, Juli Entwistle, to death, but contends he did so without malice.  A jury disagreed and convicted Sanchez of second degree murder.  It also found that he personally used a deadly weapon in the commission of the crime.  The trial court sentenced Sanchez to a term of 16 years to life in prison and ordered him to pay $7,441.44 in victim restitution.  On appeal, Sanchez raises a number of claims of instructional error and challenges the restitution order as unsupported by substantial evidence.  The People concede the latter point, and we agree that the concession is appropriate.  We affirm the judgment, reverse the restitution order, and remand the matter for the limited purpose of holding a new victim restitution hearing.

I.　　**FACTUAL AND PROCEDURAL BACKGROUND**

Juli[1] was stabbed to death in the early morning hours of July 24, 2010.  The Santa Cruz County District Attorney filed an information charging Sanchez with her murder

_____

[1] We refer to the victim by her first name to avoid confusion, as her ex-husband, Jon Entwistle (Jon), witnessed the stabbing.

(Pen. Code, § 187, subd. (a); count 1)[2] and with felony false imprisonment (§ 236; count 2) on November 2, 2010. The information alleged defendant personally used a deadly weapon in the commission of the murder (§ 12022, subd. (b)(1)).

Sanchez went to trial in May 2013. The following evidence was adduced at trial.

### A. The Stabbing

Juli lived in a studio apartment in Santa Cruz. The apartment shared a wall with a two-bedroom house, which was occupied by one of Juli's close friends, Tiffany Lang. Jon, Juli's friend and former husband, was staying on the couch in Lang's house. Jon and Juli had remained friends after their 11-year marriage came to an end in 1999.

On the evening prior to Juli's death, Juli and Lang were in the house setting up for a party the following day. Juli, Lang, and Jon smoked methamphetamine twice that evening, at approximately 5:00 p.m. and again between 8:00 p.m. and 10:00 p.m. In July 2010, Lang used methamphetamine every day and occasionally sold the drug. Jon was using the drug three or four times a week.

Sanchez, who was dating Juli, came to the house a few times that evening to speak with her. He tried to persuade her to come home to the studio apartment with him and grew agitated when she refused. Eventually, Sanchez called Juli on the phone from the studio. While the two spoke, Lang heard loud noises coming from the studio, as if something was bashing into the wall. Lang was concerned Sanchez was angry and might become violent if Juli went home. Juli told Lang not to worry and went to the studio for the night. Lang fell asleep at the kitchen table.

At some point after Juli returned to the studio, Jon, who was awake in the living room, heard banging on the wall. It sounded to him like there was a fight in the studio. Around the same time, Lang awoke to the sound of Juli screaming. Lang testified that she was no longer high when she awoke to Juli's screams. Both Jon and Lang went to

---

[2] Unspecified statutory references are to the Penal Code.

the door of the studio apartment. Jon heard Juli say, "Get off of me"; she sounded agitated. Lang knocked on the door and yelled for Sanchez to open it; he told her to go away.

Lang broke a window pane with her fist and used a broomstick to try and hit Sanchez through the broken pane. She could see Juli on the floor with blood on her face and Sanchez straddling her and holding her down. Lang saw something clenched in Sanchez's hand but could not identify the item.

Jon pushed Lang aside, opened the window, and turned the light on in the studio. Juli had her back to the window. Jon saw Sanchez coming at Juli with something in his hand. Juli said "Get that knife out of my face." Juli fell to the ground and Sanchez knelt down, placing one knee on her torso. Jon crawled in through the window. As he did so, Sanchez turned the lights off. Inside the studio, Jon turned the lights back on and pulled Sanchez off of Juli, who was gasping for air. Jon saw that furniture was barricaded in front of the studio door.

While Jon was in the studio, Lang went to call 911. Jon left the studio to help Lang find a phone. After calling 911, Lang again looked into the studio through the window. Juli was on the floor and appeared to be dead. Sanchez was sitting in a chair; he looked "blank" and "in shock." According to Jon, Sanchez's eyes were "glazed over."

Santa Cruz police officers Joshua Trog and Rodney Dukelow responded to the 911 call at approximately 4:00 a.m. on July 24, 2010. Through the studio window, Officer Trog saw Sanchez sitting on the bed with blood on his hands. Sanchez complied with Officer Trog's order to open the door, exit the apartment, and lie face down to be handcuffed. Officer Dukelow tried to locate Juli's pulse but could not. He interviewed Lang and Jon at the scene. Neither appeared, to Officer Dukelow, to be under the influence of methamphetamine.

3

### B. The Investigation

A broken methamphetamine pipe was found under Juli's body. Officers found a bloody knife under the bed in the studio. DNA from the blood on the knife matched Juli's DNA, as did DNA from the blood on Sanchez's hands. The coroner who performed the autopsy on Juli's body testified she died as a result of a stab wound to the neck, which severed her airway, an artery, and the jugular vein. The coroner opined that the knife found at the scene could have inflicted the lethal neck wound. Juli had injuries to her hands, including three superficial cuts on the right palm, a bruise on the top of the right hand, and multiple cuts on the left fingers. The coroner opined these could have been defensive wounds.

Sanchez also had some injuries, which were documented by police shortly after he was taken into custody. His injuries included a cut between the thumb and index finger on his right hand, a bruise on his right forearm, a scratch on his left wrist, and redness above his right eye and on his right cheek.

Juli and Sanchez's blood were tested for the presence of drugs. Sanchez's blood contained 0.063 micrograms per milliliter of methamphetamine. A forensic scientist with the Santa Clara County crime lab, who testified for the prosecution as a methamphetamine expert, opined that Sanchez's blood likely contained 0.08 or 0.09 micrograms per milliliter of methamphetamine at the time of the stabbing. The expert testified that less than 0.10 micrograms per milliliter is within "the therapeutic range of methamphetamine use," meaning the amount of methamphetamine a doctor might prescribe "to help combat weight problems" or for other medicinal reasons. Within that range, the effect of the drug on the human mind and body is minimal.

Juli's blood contained 2.3 micrograms per milliliter of methamphetamine. The prosecution's drug expert testified that 2.3 micrograms per milliliter of methamphetamine is close to a lethal level. High doses of methamphetamine can produce effects such as a euphoric state, aggressiveness, or psychosis, possibly including hallucinations and

delusions. The expert could not say how Juli might have been affected by the drugs in her system.

### C. Tori Lindgren

The prosecution called Jon's sister, Tori Lindgren, as a witness. Juli had agreed to house sit for Lindgren in May 2010. When Lindgren returned home, she realized Juli had not cared for the family pets as promised. Juli told Lindgren she had failed to house sit because Sanchez had "basically kidnapped" her, forcibly taking her to his sister's house in Aptos and preventing her from leaving. He did so when he learned he was not welcome in the Lindgren home while Juli was house sitting. According to Lindgren, Sanchez had told Juli he did not want her at the Lindgren house alone because she might do something behind his back.

Shortly after that incident, Lindgren drove Juli to the Aptos house to pick up some belongings she had left there. Lindgren waited in the car while Juli went inside. After a couple of minutes, Lindgren heard some commotion inside and heard Juli say "Wensy, don't. No. Stop it." Juli sounded afraid and Lindgren grew scared. Eventually, Juli rushed out of the house looking frightened. She got in the car and the two drove away.

### D. Sanchez's Former Girlfriends

Two of Sanchez's former girlfriends, Lillian Hungerford and Shannon Drake, testified for the prosecution.

Hungerford was in a relationship with Sanchez between 1997 or 1998 and 2000, at which time she moved out of state. The two had remained in contact, seeing each other when Hungerford visited town. Hungerford testified that Sanchez was jealous when they were a couple. He accused her of cheating on him several times. He also was physically abusive. On one occasion, he head butted her because he thought she was lying about her whereabouts that day. On another occasion, Sanchez punched Hungerford in the leg during a fight. The police were called. The police were called again following another of

5

their fights, during which Hungerford kicked Sanchez and he punched her in the stomach in retaliation.

Drake dated Sanchez for seven months beginning in April 2009. According to Drake, Sanchez was possessive and jealous. He frequently suspected her of cheating even though she was faithful. More than once, he came to where she worked and waited for her, making sure she was there. Once, when she refused sex, he held her down and left hickeys on her chest. Drake broke up with Sanchez in a public place because she "didn't feel safe." After the break up, he followed her to her truck, got in, and refused to leave. He then pinned Drake down and gave her a hickey on her neck.

### E.    Jury Instructions

The trial court instructed the jury on first degree murder, second degree murder, and the lesser included offense of heat of passion voluntary manslaughter (CALCRIM No. 570). Defense counsel requested that the jury also be instructed on perfect self-defense (CALCRIM No. 505) and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571). The court denied those requests, reasoning "the evidence . . . [in] support [of them was] minimal and insubstantial."

### F.    The Verdict

Towards the end of the trial, the court dismissed the count 2 felony false imprisonment charge at the prosecutor's request. The jury found Sanchez not guilty of first degree murder but guilty of second degree murder. Jurors found the personal use of a deadly weapon enhancement allegation true. The trial court sentenced Sanchez to a total term of 16 years to life in prison and ordered him to pay $7,441.44 in victim restitution. Sanchez timely appealed.

## II. DISCUSSION

### A. *The Trial Court Did Not Prejudicially Err in Refusing to Instruct on Perfect Self-Defense*

Sanchez maintains the court erroneously refused to instruct the jury with CALCRIM No. 505, which provides a defendant is not guilty of murder if he or she was justified in killing the victim in self-defense. "Perfect self-defense requires that a defendant have an honest and reasonable belief in the need to defend himself or herself." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.) A trial court is required to give a requested instruction concerning a defense, such as perfect self-defense, " '*only if there is substantial evidence to support the defense.*' " (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) " 'Substantial evidence' in this specific context is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded' " that the particular facts underlying the instruction did exist.' " (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139.) " ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the [defendant]." ' " (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) "On appeal, we independently review the court's refusal to instruct on a defense." (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 270.)

Sanchez argues the jury reasonably could have concluded that he acted in self-defense based on the injuries to his hands and face, the high concentration of methamphetamine in Juli's blood at the time of her death, and the prosecution expert's testimony that comparable amounts of methamphetamine can cause aggressiveness and psychosis. That evidence is speculative as it relates to Sanchez's self-defense theory. (*People v. Lewis* (2001) 26 Cal.4th 334, 369 [speculative evidence is not substantial evidence].) Sanchez's injuries could have been inflicted by Juli in an effort to defend herself. And the prosecution expert declined to opine as to how Juli might have reacted to the drugs in her system. Moreover, the evidence regarding Sanchez's conduct on the

7

night of the stabbing is incompatible with self-defense. Jon and Lang testified that, when they responded to sounds of a struggle in the studio, Sanchez refused to let them in and told them to go away. Sanchez also turned off the lights when Jon turned them on in an apparent attempt to hide what was happening. The knife was found under the bed, suggesting an attempt to hide the weapon and, relatedly, a consciousness of guilt.

Even if the court erred in refusing to instruct on perfect self-defense, the error did not prejudice Sanchez. We shall assume the more stringent *Chapman* standard of review applies. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Salas* (2006) 37 Cal.4th 967, 984 [standard of prejudice for failure to instruct on affirmative defense not yet determined]; *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219-1220 [same].) Under *Chapman*, an error is harmless if the record establishes beyond a reasonable doubt that the error did not contribute to the jury's guilty verdict. (*Chapman v. California*, *supra*, at p. 24.) As discussed above, here, two eyewitness accounts refuted any self-defense theory, as did evidence Sanchez attempted to hide the weapon and barricaded the door. Accordingly, we can say beyond a reasonable doubt that the court's refusal to instruct on perfect self-defense did not affect the trial outcome.

### B. The Trial Court Did Not Prejudicially Err by Not Instructing on Voluntary Manslaughter Based on Imperfect Self-Defense

Next, Sanchez argues the trial court erred by refusing to instruct the jury as to voluntary manslaughter, a lesser included offense of murder, based on imperfect self-defense. "A trial court must instruct on a lesser included offense if substantial evidence exists indicating that the defendant is guilty only of the lesser offense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).)

Manslaughter is the unlawful killing of a human being without malice. (§ 192.) There are three kinds of manslaughter: voluntary, involuntary, and vehicular. (*Ibid.*) An unlawful killing constitutes voluntary manslaughter, as opposed to murder, where one of two circumstances precludes the formation of malice: (1) the defendant kills in a sudden

8

quarrel or heat of passion, or (2) the defendant kills in an actual but unreasonable belief in the need for self-defense. (*Ibid*.; *People v. Elmore* (2014) 59 Cal.4th 121, 133-134.) Imperfect or unreasonable self-defense involves a "subjectively" real but "objectively unreasonable" belief in the need to defend. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

As noted, the trial court instructed the jury on the lesser included offense of voluntary manslaughter where the defendant kills in a heat of passion but not on voluntary manslaughter based on imperfect self-defense. Sanchez says this was error because the evidence he maintains supported giving a perfect self-defense instruction-- evidence of his minor injuries and the drugs in Juli's system--likewise supported giving a voluntary manslaughter based on imperfect self-defense instruction. We disagree because, as discussed above in the context of perfect self-defense, the evidence on which Sanchez relies is speculative with respect to any theory of self-defense.

Moreover, even assuming the court should have instructed on voluntary manslaughter based on imperfect self-defense, that error was harmless. "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818]." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) *Watson* harmless error "review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Id.* at p. 177.) In applying *Watson*, we may consider, among other things, the relative strength of the evidence supporting the existing judgment and the evidence supporting a different outcome. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.) Here, two eyewitness accounts, which jurors apparently credited, strongly supported the verdict and cannot be reconciled with a scenario in which Sanchez believed his life was in danger. The evidence he says supports such a conclusion is merely speculative. Given these circumstances, it is not reasonably probable the jury

9

would have concluded Sanchez acted in imperfect self-defense had they been instructed on voluntary manslaughter based on imperfect self-defense.

### C. The Trial Court Did Not Prejudicially Err by Not Sua Sponte Instructing on Involuntary Manslaughter Based on Unconsciousness Due to Voluntary Intoxication

Sanchez also contends the trial court erred by not sua sponte instructing the jury with CALCRIM No. 626, the model instruction on voluntary intoxication causing unconsciousness. "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) CALCRIM No. 626 provides that a defendant is guilty of involuntary manslaughter if he or she (1) "killed without legal justification or excuse"; (2) "did not act with the intent to kill"; (3) "did not act with a conscious disregard for human life"; and (4) "[a]s a result of voluntary intoxication, . . . was not conscious of (his/her) actions or the nature of those actions." Sanchez contends evidence he had methamphetamine in his bloodstream at the time of the stabbing and witness descriptions of him as "blank" with "glazed over" eyes following the stabbing supported giving CALCRIM No. 626.

We cannot agree that substantial evidence warranted giving the instruction. No evidence showed Sanchez had enough drugs in his system to render him unconscious of his actions. Rather, the only methamphetamine expert to testify opined that the amount of the drug in Sanchez's bloodstream at the time of the stabbing was too little to have much impact on a person's mind or body. And the evidence showed Sanchez had the presence of mind to barricade the door, turn out the lights to hide his actions from Jon and Lang, attempt to hide the knife, and comply with police commands. Accordingly, we find no error.

10

### D. The Trial Court Did Not Prejudicially Err by Instructing the Jury With CALCRIM No. 625

The trial court instructed the jury on how to consider evidence of Sanchez's voluntary intoxication with CALCRIM No. 625. Jurors were told: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose."

Sanchez claims the court erred by not instructing that evidence of his voluntary intoxication also could be considered in assessing whether he acted in the heat of passion. While Sanchez did not request such an instruction below, he maintains the trial court had a sua sponte duty to instruct jurors on voluntary intoxication as it related to his heat of passion defense. Alternatively, he contends his trial counsel rendered constitutionally ineffective assistance by failing to request such an instruction.

#### 1. Legal Principles and the Use of Voluntary Intoxication Evidence

A person kills in a heat of passion where (1) the victim's conduct is "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" and (2) they actually kill under a heat of passion caused by the victim's conduct. (*Manriquez*, *supra*, 37 Cal.4th at pp. 583-584.) "Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component.'" (*Id.* at p. 584.)

"Prior to 1981, voluntary intoxication was relevant generally to the defense of diminished capacity." (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1297 (*Timms*).) In 1981, the Legislature abolished the diminished capacity defense, such that evidence of voluntary intoxication no longer was admissible "to negate the *capacity* to form any mental states for the crimes charged." (*Ibid.*, italics added.) Such evidence remained admissible "to show whether the defendant *actually* had the required mental state for the

11

crime charged." (*Ibid*., italics added.)  In 1995, the Legislature amended section 22 (current section 29.4) to preclude the admission of voluntary intoxication evidence to negate implied malice.  (*Timms*, *supra*, at p. 1298; § 29.4, subd. (b) [limiting the admissibility of voluntary intoxication evidence to "the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought"].)  Thus, evidence that a defendant was voluntarily intoxicated at the time he or she killed may be admitted to show he or she did not form an intent to kill the victim (to negate express malice) but not to show he or she did not harbor a " 'conscious disregard' " for life (to negate implied malice).  (*Timms*, *supra*, at pp. 1298, 1300.)

Second degree murder can be committed with express or implied malice.  Under section 29.4, a defendant's voluntary intoxication precludes his or her conviction of second degree murder on an express malice theory.  By contrast, "app[arently,] [a] defendant's voluntary intoxication . . . would not prevent his conviction of second degree murder on an implied malice theory."  (*People v*. *Boyer* (2006) 38 Cal.4th 412, 469, fn. 40; *Timms*, *supra,* 151 Cal.App.4th at p. 1302 ["a voluntarily intoxicated offender charged with first degree murder can be convicted of second degree murder on a theory of implied malice, for which evidence of voluntary intoxication could not be considered"].)

### 2.     *Sanchez Does Not Establish Prejudice*

Sanchez complains jurors should have been permitted to consider evidence of his voluntary intoxication in determining whether he was *subjectively* provoked for purposes of his heat of passion theory.  The People respond that CALCRIM No. 625 accurately explained that voluntary intoxication may negate express malice and that section 29.4 precludes the use of voluntary intoxication to negate implied malice.

We shall assume that it was error not to instruct that voluntary intoxication evidence could be considered in assessing Sanchez's subjective state of mind for heat of

passion. Sanchez's challenge nevertheless fails because he has not established any prejudice resulting from that assumed error. (Cal. Const., art. I, § 13 [prohibiting reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*) [to prevail on a claim of ineffective assistance of counsel defendant must show trial counsel's performance was deficient and that deficiency prejudiced defendant].) As noted, in a noncapital case such as this, we review an error in failing sua sponte to instruct on all lesser included offenses and theories thereof under *Watson*.

Sanchez acknowledges that voluntary intoxication has no bearing on the objective element of his heat of passion defense--whether " 'an average, *sober* person would be so inflamed that he or she would lose reason and judgment.' " (*Manriquez*, *supra*, 37 Cal.4th at p. 586, italics added.) The only evidence that Juli engaged in what might objectively be considered sufficiently provocative conduct--Sanchez's minor injuries and the drugs in her system--is entirely speculative. As such, there is no reasonable probability the court's failure to instruct on voluntary intoxication with respect to heat of passion affected the result at trial. For the same reasons, defendant fails to show there is a reasonable probability that, but for counsel's failure to request such an instruction, the result of the proceeding would have been different, as required to establish ineffective assistance of counsel. (*Ledesma*, *supra*, 43 Cal.3d at pp. 216-217.)

### E. *Personal Use of a Deadly Weapon Enhancement Instruction*

As the People concede, the trial court erroneously instructed the jury in connection with the personal use of a deadly weapon enhancement allegation. The court instructed the jury with CALCRIM No. 3130, which governs the enhancement for being personally armed with a deadly weapon in the commission or attempted commission of specified sex offenses under section 12022.3. In relevant part, the jury was instructed: "A person is *armed* with a deadly weapon when that person: [¶] 1. Carries a deadly weapon [or has a

13

deadly weapon available] for use in either offense or defense in connection with the crime charged; [¶] AND [¶] 2. Knows that he or she is carrying the deadly weapon." "[*A*]*rming* under the sentence enhancement statutes does not require that a defendant utilize a firearm or even carry one on the body." (*People v. Bland* (1995) 10 Cal.4th 991, 997 (*Bland*).)

But the information alleged Sanchez personally *used* a deadly weapon in the commission of the murder in violation of section 12022, subdivision (b)(1).[3] " '[T]he term "uses" . . . requires something more than merely being armed." (*Bland*, *supra*, 10 Cal.4th at p. 997.) Accordingly, the jury should have been instructed with CALCRIM No. 3145, which provides, in relevant part: "Someone *personally uses* a deadly [or dangerous] weapon if he or she intentionally does any of the following: [¶] [1.] Displays the weapon in a menacing manner(./;)[¶] [OR] [¶] [2. Hits someone with the weapon(./;)][¶] [OR (3/2). Fires the weapon.]"

Sanchez argues the court's failure to instruct the jury on the use element of the enhancement constituted structural error. The People contend the error is subject to harmless error review under *Chapman* and that the error was harmless beyond a reasonable doubt.

Generally, "a trial court's failure to instruct the jury on an element of a sentence enhancement provision (other than one based on a prior conviction), is federal constitutional error if the provision 'increases the penalty for [the underlying] crime beyond the prescribed statutory maximum.' [Citation.] Such error is reversible under *Chapman* [citation], unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*People v. Sengpadychith* (2001) 26 Cal.4th 316,

---

[3] Section 12022, subdivision (b)(1) provides: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

326.)  The Supreme Court has not "foreclose[d] the possibility that 'there may be some instances in which a trial court's instruction removing *an* issue from the jury's consideration will be the equivalent of failing to submit the entire case to the jury--an error that clearly would be a "structural" rather than a "trial" error.' " (*People v. Mil* (2012) 53 Cal.4th 400, 413.)  Sanchez maintains this case presents one of the " 'rare cases' " where the conceded instructional error must be deemed structural.  (*Id.* at p. 417.)  We disagree.

The error omitted only the use element and Sanchez "has made no attempt, either in the trial court or on appeal, to argue that" he possessed but did not use the knife. (*People v. Flood* (1998) 18 Cal.4th 470, 503 (*Flood*).)  To the contrary, at trial, defense counsel argued that Sanchez was guilty of voluntary manslaughter.  On appeal, Sanchez concedes he fatally stabbed Juli.  Further, "the instructional error in the case before us did not prevent defendant from presenting evidence concerning a contested element of the crime," and thus "did not affect the content of the record and does not impair our ability to evaluate the error in light of the record." (*Ibid*.)  For these reasons, we conclude the instructional error is amenable to harmless error analysis.

And we conclude the error was harmless.  Instructional error removing an element of the crime from the jury's consideration has been deemed harmless where, as here, "in view of the actual verdict returned by the jury[,] . . . there is no reasonable or plausible basis for finding that the instructional error affected the jury's verdict." (*Flood*, *supra*, 18 Cal.4th at p. 505.)  At trial, it was undisputed that Juli was stabbed to death.  Thus, in finding Sanchez guilty of second degree murder, the jury necessarily concluded he used a deadly weapon to stab her.  Moreover, the evidence overwhelmingly supports the conclusion that Sanchez personally used a deadly weapon in the commission of the murder:  a knife the coroner testified could have caused Juli's fatal stab wound was found at the scene, Juli's blood was found on Sanchez's hands and on the knife, and Lang and Jon saw something in Sanchez's hand as he struggled with Juli.  Given these

15

circumstances, we are satisfied beyond a reasonable doubt that the trial court's failure to properly instruct the jury in connection with the personal use of a deadly weapon enhancement allegation was harmless.

### F.     *Victim Restitution*

Finally, Sanchez maintains the order requiring him to pay $7,441.44 in victim restitution was unsupported by substantial evidence.

#### 1.     *Legal Principles and Standard of Review*

Section 1202.4, subdivision (f) requires the court to order victim restitution in every case in which a victim suffers economic loss as a result of the defendant's conduct. "[S]ection 1202.4, subdivision (f)(4) includes special provisions that apply when state funds are used to provide assistance to or on behalf of a victim." (*People v. Lockwood* (2013) 214 Cal.App.4th 91, 96.)  Section 1202.4, subdivision (f)(4)(A) provides that where "the Restitution Fund has provided assistance to or on behalf of a victim . . . , the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered." According to section 1202.4, subdivision (f)(4)(B), "[t]he amount of assistance provided by the Restitution Fund shall be established by copies of bills submitted to the California Victim Compensation and Government Claims Board reflecting the amount paid by the board and whether the services for which payment was made were for medical or dental expenses, funeral or burial expenses, mental health counseling, wage or support losses, or rehabilitation."

We review a victim restitution award for abuse of discretion.  (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)  " ' "When there is a factual and rational basis for the amount of restitution ordered by the trial court, no abuse of discretion will be found by the reviewing court." ' "  (*Ibid*.)  But "[i]f there is no substantial evidence to support

the award, and assuming no other rational explanation, the trial court will have obviously abused its discretion." (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 993 (*Thygesen*).)

### 2. Factual Background and Contentions on Appeal

Sanchez was ordered to pay $7,441.44 in victim restitution to the Revenue Recovery and Compliance Division. That amount of restitution was recommended in the probation report based on a document from the district attorney's office indicating that the Victim Compensation and Government Claims Board had a $7,441.44 claim on file for Risa Durley. According to the probation report, Durley is Juli's sister and the funds went to cover funeral expenses. At sentencing, defense counsel objected to the recommended restitution award on the ground it was not supported by receipts or other documentation. The court overruled that objection, reasoning the documentation in the probation report was sufficient.

Sanchez argues the restitution order should be set aside as an abuse of discretion because the $7,441.44 figure is unsupported by substantial evidence, such as documentation or testimony. The People concede the restitution award should be reversed, reasoning that section 1202.4, subdivision (f)(4)(B) applied because Durley received compensation from the Restitution Fund and required "[t]he amount of assistance provided by the Restitution Fund . . . be established by copies of bills submitted to the California Victim Compensation and Government Claims Board reflecting the amount paid by the board" for funeral expenses.

### 3. Analysis

We accept the People's representation that Durley received compensation from the Restitution Fund.[4] As such, the court's award of restitution was governed by section

---

[4] The record is unclear on this point. The document from the district attorney's office in the probation report states "Per PC 1202.4(f)(2) restitution should be ordered for the above claim(s)." Section 1202.4, subdivision (f)(2) provides "Restitution ordered pursuant to this subdivision shall be ordered to be deposited to the Restitution Fund to the (continued)

1202.4, subdivision (f)(4)(A) and (f)(4)(B). Under section 1202.4, subdivision (f)(4)(B), the amount of compensation Durley received was required to be established by "copies of bills submitted to the California Victim Compensation and Government Claims Board." That requirement could have been met with "[c]ertified copies of these bills provided by the board . . . together with a statement made under penalty of perjury by the custodian of records that those bills were submitted to and were paid by the board." (§ 1202.4, subd. (f)(4)(B).) It is undisputed the prosecution submitted neither certified copies of bills nor any declaration signed under penalty of perjury by any custodian of records showing the board paid the bills. Thus, the restitution order lacks the necessary evidentiary support and must be vacated and the case remanded to the trial court for a new restitution hearing. (*Thygesen*, *supra*, 69 Cal.App.4th at p. 996.)

## III.    DISPOSITION

The judgment is affirmed in all respects with the exception of the restitution order, which is reversed. The matter is remanded for the limited purpose of holding a new hearing on the amount of victim restitution.

---

extent that the victim . . . has received assistance from the California Victim Compensation and Government Claims Board . . . ." Thus, the probation report corroborates the People's representation. However, apparently inconsistently, the abstract of judgment indicates the $7,441.44 in restitution was to be paid to the victim, as opposed to the Restitution Fund. This matter should be clarified on remand.

_____

Walsh, J.[*]

WE CONCUR:

_____

Rushing, P. J.

_____

Elia, J.

People v. Sanchez
H040624

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.