[No. C067377. Third Dist. Mar. 5, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ELBERT LOCKWOOD, Defendant and Appellant.

**COUNSEL**

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, Acting P. J.**—Defendant Michael Elbert Lockwood appeals from a restitution order entered after he was convicted of corporal injury to a cohabitant and possession of a firearm by a convicted felon. The trial court ordered defendant to pay $20,900.37 in restitution to reimburse the Restitution Fund for funds paid on behalf of the victim. Defendant contends that the trial court erred by not releasing to him records the California Victim Compensation and Government Claims Board (Board) used to establish the amount of assistance to be paid on behalf of the victim. (Pen. Code, § 1202.4, subd. (f)(4)(C).)[1]

We agree that the trial court erred by not releasing the Board's records to defendant. However, the error was harmless because the Board's records

---

[1] All undesignated section references will be to the Penal Code.

established that the treatment the victim received, and for which the Board provided reimbursement, resulted from defendant's criminal conduct.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In June 2009, C.D. was living with defendant, her boyfriend. The month before C.D. moved in with defendant, she had an argument and physical altercation with her husband during which her husband pushed her. Her husband had also previously forced her to have sexual relations with him against her will and made threats against her, her family, and her animals.[3]

On June 14, 2009, defendant wanted C.D. to go to an event with him but she decided to go elsewhere. As she got dressed, he grabbed her by the throat and slammed her head against the wall. The force of the impact put a hole in the wall. Defendant held C.D. by the throat, impeding her breathing. After she was released, her neck hurt badly and she still had difficulty breathing.

When C.D. started to pack her bag and leave, defendant tried to prevent her from leaving, repeatedly removing clothes from her bag, and also putting his arms around her. She bit him on the shoulder as he hugged her.

Eventually, C.D. drove to a friend's home. The friend took C.D. to a doctor who found slight muscle spasms in C.D.'s neck, a contusion to the back of her head, and swollen wrists. C.D.'s injuries were photographed the following day.

A jury convicted defendant of corporal injury to a cohabitant (§ 273.5, subd. (a)) and possession of a firearm by a convicted felon (former § 12021, subd. (a)(1)). In addition, he admitted seven prior serious or violent felony convictions. (§§ 667, subds. (b)–(i), 1170.12.) The trial court sentenced defendant to state prison for two concurrent terms of 25 years to life. We affirmed the conviction on appeal. (*People v. Lockwood, supra,* C066096.)

After a contested restitution hearing, defendant was ordered to pay $20,900.37 to the Board to reimburse payments the Board had made to the victim's medical providers from the state's Restitution Fund.

## STATUTORY BACKGROUND

■ Under the California Constitution, a victim is entitled to restitution. (Cal. Const., art. I, § 28, subd. (b)(13).) Section 1202.4 requires the court to

---

[2] Our statement of facts is based, in part, on our opinion in defendant's appeal from the judgment and sentence. (*People v. Lockwood* (Dec. 27, 2011, C066096) [nonpub. opn.].) We granted defendant's request to take judicial notice of the record on appeal in that case.

[3] As did the trial court, we take judicial notice of a declaration C.D. filed in her husband's dissolution action against her. (Evid. Code, § 459, subd. (a).)

order restitution. (§ 1202.4, subd. (f).) The order must be sufficient to reimburse the victim "for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." (§ 1202.4, subd. (f)(3).) And the defendant is entitled to a hearing to dispute the amount of restitution. (§ 1202.4, subd. (f)(1).)

" 'Section 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property.' [Citations.] ' "This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.] When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount." ' [Citation.]" (*People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320 [125 Cal.Rptr.3d 878].)

Pertinent to this case, section 1202.4, subdivision (f)(4) includes special provisions that apply when state funds are used to provide assistance to or on behalf of a victim:

"(A) If, as a result of the defendant's conduct, the Restitution Fund has provided assistance . . . on behalf of a victim . . . , the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered.

"(B) The amount of assistance provided by the Restitution Fund shall be established by copies of bills submitted to the California Victim Compensation and Government Claims Board reflecting the amount paid by the board and whether the services for which payment was made were for medical . . . expenses [or] mental health counseling . . . . Certified copies of these bills provided by the board and redacted to protect the privacy and safety of the victim or any legal privilege, together with a statement made under penalty of perjury by the custodian of records that those bills were submitted to and were paid by the board, shall be sufficient to meet this requirement.

"(C) If the defendant offers evidence to rebut the presumption established by this paragraph, the court may release additional information contained in the records of the board to the defendant only after reviewing that information in camera and finding that the information is necessary for the defendant to dispute the amount of the restitution order." (§ 1202.4, subd. (f)(4)(A), (B), (C).)

## RESTITUTION HEARING

In preparation for the restitution hearing, defendant subpoenaed records from the Board. Pursuant to the subpoena, the Board sent the trial court 44 pages of redacted medical records, primarily patient receipts and insurance claim forms. After reviewing the reports, the trial court ordered copies for the prosecution and the defense. Although the incident occurred on June 14, 2009, many of the insurance claim forms were for late November and early December of that year.

At the restitution hearing, the prosecutor argued and the trial court agreed that the probation report was prima facie evidence that the Board had provided assistance on behalf of C.D. as a result of defendant's conduct. (§ 1202.4, subd. (f)(4)(A).)[4] This triggered a statutory presumption that the amount paid ($20,900.37) was a direct result of defendant's criminal conduct.

The redacted documents from the Board were marked as defense exhibit 1, records from Kaiser Permanente for June 2009 as defense exhibit 2, a summary of property sale and mortgage records for C.D. and her estranged husband as defense exhibit 3, and a copy of an El Dorado Superior Court index of civil actions between C.D. and her estranged husband as defense exhibit 4.

Board Attorney Kyle Hedum appeared in court pursuant to a defense subpoena. Hedum brought additional medical records pertaining to medical bills incurred by C.D. These records were not redacted, and Hedum said he would provide them to the trial court if so ordered.

Hedum testified that the Board's staff analyzes medical bills, and sometimes reviews crime reports, to determine whether costs spent on medical treatment were related to the qualifying crime. The Board has agreements with local programs, including a program in El Dorado County, that work with victims on submitting claims and verifying that the claims are related to crimes in the case.

On the next day of the hearing, the trial court stated that it had reviewed in camera the additional reports that Hedum had provided. The court noted that some of the records had not previously been provided pursuant to the subpoena. The records were marked defense exhibit 1-A.

Defense counsel argued that there was no "nexus," or "correlation," between defendant's June 2009 criminal conduct for which he was—and

---

[4] Further undesignated references to subdivisions are to subdivisions of Penal Code section 1202.4.

remained—incarcerated and C.D.'s seven-day hospitalization more than five months after the assault. Counsel asked the court to consider the four defense exhibits and take judicial notice of a May 28, 2009, declaration by C.D. in a marriage dissolution case referenced in the civil case index.

Defense counsel noted that the subpoenaed records showed that the bulk of the medical costs had been incurred as a result of the November 2009 hospitalization. Counsel claimed that the Kaiser Permanente records from June 2009 did not indicate any injuries that would be expected to require hospitalization more than five months later. Counsel suggested that, if the hospitalization had been based on "some sort of mental breakdown," the cause was related to C.D.'s pending divorce and loss of her home and not to defendant's criminal conduct.

Defense counsel asked the trial court to read the C.D. declaration, which he said included her statement that "her husband committed domestic violence and threatened to kill her and her animals." After reading the declaration, the court said the declaration contained evidence of domestic violence "occurring on far more consistent a basis than the one-time incident on June 14th" and "involving . . . her family members also." The court said the marital strife described in the declaration "could easily have caused the November incident as much or more likely than the June incident." Consequently, the court initially concluded that defendant had rebutted the presumption that the entire amount of assistance provided was a direct result of defendant's criminal conduct.

The prosecutor countered that, even with the declaration, there was no evidence of nexus between the marital conflict and the November 2009 hospitalization. He argued that, in light of Hedum's testimony that the Board had checked with service providers and had found a link between defendant's conduct and the November 2009 hospitalization, it was defendant's burden to show that the Board's checking had been inaccurate or incorrect.

The trial court said it would allow defense counsel to recall Hedum to ask whether the Board had considered C.D.'s declaration and the "other acts of domestic violence that [she] was subject to" when it determined that defendant was responsible for the November 2009 hospitalization. The court noted that, if Hedum "did [consider that evidence], I think you're out of luck. If he didn't—or if [the Board] didn't, I should say, you may have a theory that might work."

Defense counsel again subpoenaed Hedum, as well as other Board employees, to appear in court and to bring the Board's "entire file for" C.D. Hedum informed the court that he did not intend to return to court but said another

Board official would attend the hearing and bring the claim file for the court's inspection if it determined that defendant had rebutted the presumption.

At the continued hearing, the trial court stated that it had "somewhat new and different thoughts" about the matter. The court stated that "[c]ertainly, the presumption exists" that C.D.'s November 2009 hospitalization "was a direct result of" defendant's June 2009 assault. The court said there was "a reasonable inference" that a "domestic violence incident" with C.D.'s estranged husband, which had "occurred a month or so earlier" on May 20, 2009, "could have caused" her hospitalization. The court described that incident as "not all that shocking." C.D.'s husband allegedly had shoved her "a couple of times leaving no injuries" and had made "prior threats."

The trial court stated: "Now, I'm not sure we can tell which, if either or both of these acts of domestic violence, caused the hospital bill in late November. But there is a presumption that the defendant's criminal conduct did cause it. And the presumption doesn't require that the defendant's conduct be the only results [sic] or the only direct result [sic].[5] It only requires that it be a direct result [sic]. [¶] Indicating there can be more than one direct result [sic], which I think you may possibl[y] have in this case, that being the case, I find that this presumption still applies." Following discussion with defense counsel, the court added: "And the statute, I think, clearly is written so that the prosecution never has to establish that there was no intervening event, that there [were] no true causes or no multiple causes. I think all the statute requires is that there be a direct result. And I think that the presumption stands based upon the conduct of your client and the facts of this case."

## DISCUSSION

### I

### *Forfeiture*

We first consider the Attorney General's argument that defendant has forfeited his claim that the Board's additional records should have been turned over to him because, during the restitution hearing, defense counsel "did not request access to" the "additional board records" for the November hospitalization. The argument has no merit.

At the continued restitution hearing, defense counsel acknowledged that he was "only entitled to some" of the documents Hedum had provided "until

---

[5] Obviously, the court meant to say that defendant's *conduct* was a "cause" not a "result."

[defense counsel overcomes] some presumption." Defense counsel stated he did "not have the records for the seven-day hospital stay" from "November 29th through December 7th," even though "clearly that is where this money went to pay." Counsel stated he "did not know" why C.D. was hospitalized because "everything is redacted." In response, the trial court stated, "I've got it here. You may want to look at it." However, the prosecutor objected that the court first had "to find that [the defense has] adduced some evidence on their own to suggest" a cause other than defendant's conduct. Plainly, the trial court understood defense counsel's argument as a request for the "additional board records." The court would have granted the request but for the prosecutor's objection. No further defense objection was required.

## II

### *Application of the Statute*

Defendant and the Attorney General argue over whether the presumption created by subdivision (f)(4) affects (1) the burden of producing evidence or (2) the burden of proof. Defendant contends that it is a presumption affecting the burden of producing evidence. He reasons that, since the presumption affects only the burden of producing evidence, the trial court should have disclosed the Board's records once he produced evidence that the injuries for which C.D. was hospitalized may not have resulted from his conduct. The Attorney General responds that the trial court properly treated the presumption as affecting the burden of proof and, therefore, because defendant failed to rebut the presumption by establishing that C.D.'s hospitalization was not a result of his conduct, the trial court properly did not disclose the Board's records. Neither party interprets the statute correctly.

■ In a nutshell, the presumption created by subdivision (f)(4)(A) affects the burden of proof. However, a defendant is entitled to release of the Board's records, regardless of the nature of the presumption, if (1) the defendant offers evidence to rebut the presumption and (2) the trial court determines after an in camera review of the records that the records are relevant to the dispute.

We first turn to the nature of the presumption.

■ "Every rebuttable presumption is either '(a) a presumption affecting the burden of producing evidence or (b) a presumption affecting the burden of proof.' (Evid. Code, § 601.)" (*People v. Dubon* (2001) 90 Cal.App.4th 944, 952–953 [108 Cal.Rptr.2d 914].)

As noted, subdivision (f)(4)(A) provides in relevant part: "If, as a result of the defendant's conduct, the Restitution Fund has provided assistance . . . on

behalf of a victim . . . , the *amount of assistance provided shall be presumed to be a direct result* of the defendant's criminal conduct and shall be included in the amount of the restitution ordered." (Italics added.)

■ The statute's use of the word "direct" signifies that the payment is presumed to have resulted *directly*, or *in fact*, from the defendant's criminal conduct. (*People v. Jones* (2010) 187 Cal.App.4th 418, 424–425 [114 Cal.Rptr.3d 8] [construing "direct or actual causation" as meaning "cause in fact"].) Stated differently, the defendant's conduct is presumed to be *a* cause in fact of the Board's payment. (*Ibid.*) This presumption affects the burden of proof because it imposes upon defendant the burden to prove the nonexistence of the presumed fact—that is, to prove his conduct is *not* a cause in fact of the Board's payment. (Evid. Code, § 606.)

■ Since the subdivision (f)(4)(A) presumption affects the burden of proof, a defendant challenging the presumption cannot prevail unless he establishes that his conduct did not cause the victim's injuries. As we discuss later, a defendant may be liable for restitution for injuries caused by his conduct even if other causes contributed to the injuries. However, under subdivision (f)(4)(C), the defendant need not fully rebut the presumption to obtain the Board's records. Instead, the defendant may obtain the Board's records in order to challenge the presumption if he offers evidence to rebut the presumption.

Unlike subdivision (f)(4)(A), which contains a presumption affecting the burden of proof, subdivision (f)(4)(C) merely imposes a duty of *producing evidence*. (Evid. Code, § 603.) Thus, to obtain the sealed Board records, the defendant must first "offer[] evidence" tending to rebut the presumption. (Subd. (f)(4)(C).) After the defendant does so, the trial court must examine the sealed records in camera to determine whether the information is necessary for the defendant to dispute the amount of restitution. If the court finds that the sealed records are necessary, the defendant is entitled to use *both* his original evidence *and* the sealed material in his effort to rebut the subdivision (f)(4)(A) presumption.

Here, the trial court should have disclosed the Board's records to defendant because he (1) produced evidence tending to rebut the presumption that the amount of assistance provided to C.D. by the Restitution Fund was a direct result of defendant's conduct and (2) an in camera review of the additional records would have shown that they were relevant to the dispute.

As the trial court initially found, defendant offered evidence that tended "to rebut the presumption established by [subd. (f)(4)(A)]" (subd. (f)(4)(C)) by suggesting the medical treatment underlying the Board's payment had resulted from marital strife and injury inflicted by the victim's husband rather

than from defendant's criminal conduct. Defendant having offered evidence to rebut the presumption, the trial court should have reviewed the Board's records to determine whether "the information is necessary for the defendant to dispute the amount of the restitution order." (Subd. (f)(4)(C).) Because he offered that evidence and even a cursory review of the records by the trial court would have revealed that the records were relevant to restitution, defendant was entitled to release of the Board's records. However, relying on an erroneous interpretation of subdivision (f)(4), the trial court refused to review the Board's records and release appropriate information because defendant had not rebutted the presumption that the amount of assistance provided to C.D. by the Board resulted from defendant's criminal conduct.

## III

### *Harmless Error Analysis*

The conclusion that the trial court erroneously interpreted the statute does not end the matter. When we find error in trial court proceedings, we are constitutionally obligated to consider whether the error resulted in a miscarriage of justice. If it did not, we must affirm, despite the error. (Cal. Const., art. VI, § 13.)[6]

Here, the parties have not undertaken a harmless error analysis in their briefing on appeal. Nonetheless, establishing prejudice is part of an appellant's burden on appeal. (*People v. Coley* (1997) 52 Cal.App.4th 964, 972 [60 Cal.Rptr.2d 870].) Therefore, we must consider whether the error of which defendant complains was prejudicial—that is, whether it is reasonably probable that he would have obtained a more favorable result if the trial court had not erred. (*People v. Lines* (1975) 13 Cal.3d 500, 516 [119 Cal.Rptr. 225, 531 P.2d 793].)

■ Preliminarily, we note that the question of whether defendant was properly ordered to reimburse the Restitution Fund even though there may have been other, concurrent causes of the victim's hospitalization is governed by the "substantial factor" test for proximate cause of victim loss. (*People v. Holmberg, supra,* 195 Cal.App.4th at pp. 1321–1322; see *People v. Jones, supra,* 187 Cal.App.4th at pp. 424–427.) " ' "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." [Citation.] Thus, "a force which

---

[6] "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.)

plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor" [citation], but a very minor force that does cause harm is a substantial factor [citation]. This rule honors the principle of comparative fault.' [Citation.]" (*People v. Holmberg, supra*, at pp. 1321–1322.)

Therefore, to overcome the subdivision (f)(4)(A) presumption that the assistance given the victim was "a direct result of the defendant's criminal conduct," a defendant must prove that his criminal conduct played, *at most*, " ' "only an 'infinitesimal' or 'theoretical' part in bringing about" ' " the injury. (*People v. Holmberg, supra*, 195 Cal.App.4th at p. 1322; see *People v. Jones, supra*, 187 Cal.App.4th at pp. 424–427.)

To determine whether the error was harmless, we consider the Board's records, which should have been released to defendant. Those records include C.D.'s medical and therapy records.

Records for the Sutter Delta Medical Center in Antioch show that C.D. was brought to the hospital on November 29, 2009, following an overdose of several drugs. The overdose resulted either from a serious complication of antipsychotic drug use or a suicide attempt. On the morning of the hospitalization, a bystander found C.D.'s car parked near the Sacramento-San Joaquin River Delta. The car's engine was running, windows closed, and heater on. C.D. was comatose and was dressed in three layers of clothing. Around her were empty pill bottles, some of which were for psychiatric medication. There were no visible signs of trauma and no active bleeding. The hospital records do not provide any indication that C.D. or anyone else explained why C.D. may have attempted suicide.

In addition to the hospital records, the sealed materials include a five-page "Treatment Plan (Form) (Confidential)" that was completed by C.D.'s treating therapist and marked "Received" by the Board. The form, dated November 24, 2009 (five days *prior to* the suicide attempt), lists the "type of crime [the client is] being treated for" as "assault."

In response to the question, "What is your present understanding of the details of the crime," the therapist wrote: "Assailant falsely imprisoned claimant and assaulted her by slamming her into a wall (repeatedly) while choking her." This, of course, accurately describes defendant's criminal conduct against C.D.

Under the heading "Treatment Plan," the form lists "Symptom/Behavior" of "Anxiety, Panic," "some agoraphobia," "flashbacks from assault (PTSD)," and "depression." The therapist listed a planned "Intervention" following each "Symptom/Behavior."

In different handwriting, the notation "(PTSD)" is appended following the word "depression." Also in the different handwriting, the notation "Attempted Suicide (PTSD) (11/28/09)" is appended as a further "Symptom/Behavior." The planned "Intervention" for this "Symptom/Behavior" is "Suicide Prevention & Life Skills."

The form is signed by the treating therapist. The handwritten date, "11/24/09," was not altered, even though the form obviously had been updated following the suicide attempt several days later.

These records show that, even prior to the suicide attempt and hospitalization, C.D. was being treated for symptoms arising from defendant's criminal conduct. Hospital records confirmed that C.D. was treated for a possible suicide attempt, and the therapist's treatment plan shows that she regarded the suicide attempt as a further symptom or behavior arising from defendant's criminal conduct. No alternative cause for the suicide attempt and ensuing hospitalization appeared in any of the sealed records.

█ Thus, the records established that defendant's criminal conduct played more than an infinitesimal or theoretical part in the emotional or mental injuries for which the victim was treated in November 2009, and defendant could not have successfully used the Board's records to rebut the presumption that the amount of assistance provided by the Restitution Fund was a direct result of his criminal conduct. (Subd. (f)(4)(A).) The trial court's failure to release the Board's records to defendant was harmless.[7] Defendant was properly ordered to make restitution to the Board in the amount of $20,900.37.

---

[7] Defendant also claims that the trial court's failure to disclose the records violated his due process rights. We need not consider the merits of this due process contention because any due process violation was also harmless.

A violation of a defendant's federal due process rights does not require reversal if the violation was harmless beyond a reasonable doubt. (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1128 [38 Cal.Rptr.2d 335]; *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824].) Here, any error in not disclosing the records was harmless beyond a reasonable doubt for the same reasons discussed above. Those records established that the costs paid by the Board on behalf of C.D. resulted from defendant's criminal conduct.

## DISPOSITION

The restitution order is affirmed.

Butz, J., and Duarte, J., concurred.

A petition for a rehearing was denied March 28, 2013.