Filed 6/4/26  P. v. Cooper CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KEVIN ARCHIE COOPER,<br><br>    Defendant and Appellant. | F088878<br><br>(Super. Ct. No. F21903271)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell, III, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Dina Petrushenko and Corinne D. Heinstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant Kevin Archie Cooper and his son of second degree murder and found true an enhancement allegation that defendant personally and intentionally discharged a firearm causing great bodily harm and death (Pen. Code, § 12022.53, subd. (d)).  (Undesignated statutory references are to the Penal Code.)  The trial court sentenced defendant to 15 years to life for second degree murder plus 25 years to life for the section 12022.53, subdivision (d) enhancement.  The court also held defendant and his son are jointly and severally liable for $5,439.79 in restitution to the California Victim Compensation Board for the victim's funeral expenses.

On appeal, defendant claims the trial court prejudicially erred by excluding pictures of the victim holding guns and by failing to instruct the jury, sua sponte, on the right to use reasonable force to eject a trespasser (CALCRIM No. 3475).  He also contends the cumulative effect of such errors prejudiced him.  Defendant also argues the victim restitution award for expenses paid by the Victim Compensation Board violates his right to due process and should be reversed because the prosecution did not present bills to establish the amount paid as required pursuant to section 1202.4, subdivision (f)(4)(B). Additionally, he asserts the abstract of judgment should be corrected to reflect he was sentenced to 40 years to life (rather than 50 years to life).  The People disagree with defendant's first three contentions but they agree the restitution order should be reversed, the case should be remanded for a new restitution hearing, and the abstract of judgment must be corrected.

We vacate the section 1202.4, subdivision (f)(4)(B) restitution order, remand the matter for the trial court to hold a new restitution hearing, direct the court to correct the abstract of judgment, and otherwise affirm the judgment.

2.

# FACTUAL BACKGROUND

Defendant and his son, Aaron Cooper (Aaron) were charged with the murder of Michael Williams. It was further alleged defendant personally and intentionally discharged a firearm which proximately caused great bodily injury or death within the meaning of section 12022.53, subdivision (d). Before trial, the court consolidated defendant and Aaron's cases. The trial was heard by a separate jury for each defendant.

## Prosecution Evidence

Christopher Gayer testified he met Williams through work. As of early 2021, Gayer had known Williams for approximately five or six years. Williams was living in his vehicle at the time and needed help. Gayer offered to let Williams stay with his family for a little while "so [Williams] could get back on his feet." Williams stayed in a back room of Gayer's house for approximately a month or a month and a half, until February 22, 2021. Gayer did not charge him rent.

At first, "it was all right for a couple of days and then it just got bad," according to Gayer's wife, Shanda. She testified Williams "changed." He "went from … being [a] happy, normal person … to … being angry and threatening." Gayer explained they started noticing Williams going through their belongings, so Gayer confronted him. Williams immediately became aggressive and threatened to beat up Gayer. Gayer and Shanda told Williams he had overstayed his welcome and they wanted him to leave. Williams responded "[v]ery negatively" and was "aggressive" and "really volatile." Williams started threatening Gayer, saying "he was going to beat [Gayer's] head in with a 40 bottle," and "[a]t the end of it all he would be the only one left, everything that was [Gayer's] was his," and Gayer "needed to get out of [his] own home."

Shanda testified Williams was aggressive and angry toward her children "and wanted to hurt them." She stated Williams would yell that he wanted to hurt the kids, "kill them." He "threatened [their] family a lot," threatening to shoot up the house or

3.

burn it down with the children in it if they kicked him out.  Williams told Gayer and Shanda that if they called the police he would have their house "shot up" and they "would all be dead."[1]  Gayer knew Williams "knew lots of people, and he was always boasting about being an active gang member," so he understood the threat as Williams saying he was going to have the house shot up "by whoever else he was involved with."  Gayer testified Williams was on his phone talking to other people about robbing Gayer's house, "and possibly shooting it up, and burning it down."  Gayer believed Williams was capable of carrying out these threats at any moment because Williams was very aggressive.  Williams spoke of the violent crimes he had committed in the past, and, while Gayer worked with him, Williams tried to beat up their boss a couple of times.  The threats scared Shanda and she took them seriously.  She and Gayer put an extra lock on the door to their room so Williams could not come in.  Shanda explained she used to babysit two children for income but, two weeks after Williams moved in, she lost that job because the parents did not want the children to be around Williams.

According to Shanda, on February 22, 2021, Williams began gathering all of her and her children's "stuff and throwing it away" in the trash, including toys, books, and important paperwork like birth certificates.  She asked him to stop and he laughed.  Shanda yelled at Williams to leave the house and then she laid down and went to sleep.[2]  She recalled hearing a big bang noise, but she went back to sleep.  The next thing she recalled was the police getting her out of the house.

Gayer testified he started reaching out to people for help with Williams and he eventually reached out to Aaron, defendant's son, a day or two before February 22, 2021.  Aaron lived a couple of blocks away from Gayer and they knew each other through

---

[1] Both Shanda and Gayer testified they never saw Williams with a firearm.

[2] Shanda denied drinking the night of February 22, 2021, but she testified that she was "on Xanax and Benadryl."  She had done methamphetamine one or two nights before.

mutual friends. Gayer went to Aaron's house on February 22, 2021, and asked Aaron to help him get Williams out of his house. Gayer saw defendant with a semiautomatic firearm while at Aaron's house. Aaron and defendant agreed to help but they did not come up with a plan.

Aaron and defendant went to Gayer's house shortly after. Gayer was in the garage when they arrived and he told them which room Williams was in. Gayer was in the hallway towards the entryway pacing back and forth and he heard some muffled arguing and Williams laughing and "being aggressive." Gayer was "nervous, … scared," from "everything that had been going on between [him] and Williams, [he] was scared to be in [his] own home." He heard defendant "[v]ery calmly" tell Williams he needed to leave and that he had overstayed his welcome. Defendant was holding a gun at his side. Gayer heard Williams talking to someone on the phone and then he "heard a pop and screaming." Leesa P., Williams's friend, ran out of the room "panicking, screaming he's dead." She grabbed onto Gayer and dropped to the ground. Gayer saw defendant in the doorway and Aaron outside of the room in the hallway. They ran out of the house after the pop. Leesa also left the house.

Gayer testified he banged on the door to his and Shanda's room and tried to wake her up but she fell back asleep. Then, he got a call from Aaron. Aaron told Gayer to pick up the bullet casing and come over. Gayer picked up the ejected shell casing from the bathroom doorway and went to Aaron and defendant's house. On the way, Gayer threw the shell casing, which he had put in a crushed can, out the car window. Aaron and defendant told Gayer to follow them and they went to another house. Gayer was instructed to burn his clothes and someone gave him new clothes to wear. He went to a hotel with others where he stayed overnight. The next morning Gayer was taken back to his vehicle and he went to a friend's house and then to his mother's house where he found Shanda. Defendant told Gayer not to say anything or something was going to happen to

5.

him. Gayer denied asking defendant and Aaron to bring the firearm to his house or to kill Williams. He also denied asking them to scare Williams with a firearm.

Leesa P. testified she and Williams were friends and they would occasionally "hook up." She did methamphetamine with Williams for five years, including at Gayer's house. She was at Gayer's house with Williams six days a week around the time of the incident. Regarding February 22, 2021, Leesa testified she and Williams were in Williams's room when "all of a sudden two people enter the room … one was standing in the doorway, another one was in the hallway, and they both exchanged words." One of the men was wearing a ski mask and another was wearing a mask just over his face, from his eyes down, "like a Covid mask." They were about five feet away from Williams. One of them said, "you have to leave," and Williams said, "no, I'm not going to leave, you are going to have to shoot me."[3] Williams said he was going to call his cousins or family members. Then, the guy in the hallway said, "do it," and "then the guy that was holding the gun shot [Williams]."[4] Leesa saw blood coming from Williams's head where he had been shot; he was dead. The men took off and Leesa got in Williams's car and went to a minimart because she was scared the men would follow her home.[5] Leesa's boyfriend picked her up and took her home. Leesa told her mother about the shooting and they called the police.

Officer Kaosoy Saechao was dispatched to Gayer's house at 9:56 p.m. on February 22, 2021, in response to a call indicating someone was possibly shot at that

---

[3] In one of her interviews with police, Leesa reported one of the men said, "[M]y boy wants you out," and Williams "giggled." In another interview, Leesa stated one of the men was pacing back and forth and "the first guy looked at the second guy … and the second guy said do it." The "first guy" then raised up his hand and shot Williams.

[4] Leesa testified she only saw one firearm. In one of her interviews with the police, Leesa stated she never saw Williams with weapons.

[5] In one of her interviews with police, Leesa reported that before she left, she looked at Gayer and asked him "why" and he said, "because he just wouldn't leave."

residence.  Upon entering the residence, Saechao found a deceased male lying on the floor with blood on his head in one of the bedrooms.  Saechao did not search the bedroom, though he did not see any firearms, knives, or weapons in plain view. Homicide detective Joshua Alexander also responded to the scene.  He also did not see any firearms and only found knives in Gayer's bedroom.  He met with Leesa on February 23 and February 25, 2021, and took recorded statements regarding the details of what she saw.  He also spoke with Leesa over the telephone on February 24, 2021, in a call that was also recorded.  He conducted an interview with Gayer on March 1, 2021.

The police also conducted a recorded interview with defendant on April 22, 2021. Defendant reported that he knew Gayer through his son, Aaron, but he had never been to Gayer's house.  The police told defendant they had a video of him and Aaron pulling up and parking at Gayer's house.  Defendant reported Gayer was at their house in tears and defendant heard him telling Aaron that "some guy was threatening to get him and his kids, threatening to kill 'em."  Gayer did not want to call the cops.  Defendant then admitted that he "went over there and … asked the guy if he would leave" and said, "Chris don't want you here no more."  The guy "started laughing and making threats and started to call somebody."  Defendant stated, "He was threatening to have his friends come and take care of us," "[b]asically, threatening to have us all shot."  Defendant reported the person he was telling to leave "had something in his waistband," but he never saw anything in his hands.  Defendant stated the man had a hand in his waistband and his shirt was covering it and he was on the phone.  Defendant stated they "ended up leaving," and he did not know "what exactly happened after that."  He explained he "wasn't gonna stick around and have a bunch of gang members show up on me …." Defendant stated he heard something happened at Gayer's house "[j]ust right now," during his interview.  Defendant denied having a gun at Gayer's house or pointing one at the person there.  He also denied that Aaron had a gun and he denied burning his clothes.

7.

During an autopsy of Williams's body, a copper bullet was retrieved from the bottom of his skull. An external examination of the body showed a gunshot wound on the right side of Williams's head, above and behind the ear; there was no exit wound. The forensic pathologist who conducted the autopsy opined that the wound was caused by "a distant gunshot wound," meaning a distance of over two to two and a half feet from the barrel of the gun to the wound, given that there was no evidence of blackening on the skin or gunpowder residue around the wound.

**Verdict and Sentencing**

The jury found defendant guilty of second degree murder of Williams (§ 187, subd. (a), count 1). The jury also found true the allegation that during the commission of count 1, defendant intentionally discharged a firearm which proximately caused great bodily injury or death to Williams within the meaning of section 12022.53, subdivision (d).

The trial court sentenced defendant to 15 years to life on count 1 plus an additional and consecutive term of 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d). In doing so, the court denied the defense's request to strike or stay the section 12022.53 enhancement, finding "that dismissal of the enhancement would … danger [*sic*] public safety."

## DISCUSSION

**Exclusion of Photographs of Williams with a Gun**

Defendant claims the trial court erred by excluding photographs of Williams holding a gun. We conclude the court did not abuse its discretion.

**Relevant Factual Background**

During trial, defendant's counsel offered two photographs of Williams. Counsel explained that he had "not tried to introduce this into evidence" as the foundation was

"still … lacking a bit," and he was "trying to still understand who … took a screen shot of the photos." He explained:

> "They appear to me to be Facebook stories, which are different than actual Facebook postings, in that the Facebook story disappears after a set given of time, potentially 24 hours, I'm just explaining that … from my own experience as I can see the lines on the top."

> "I don't believe this image exists in the public domain anymore. So the individual who snapped them, I believe would have to come in and explain that they did that to give some type of timeframe reference.

> "What I would like to do today is have … Leesa [P.] identify whether or not that is or is not [Williams], not introduce the photos into evidence, and see if I can lay that foundation a little further with who brought the photos. Ultimately, if I cannot lay foundation, I may request the Court to allow me to introduce these photos if … Leesa … can identify that that is [Williams], but I do not make any claim that I still do not know when either the photo was taken or posted. I do see it says November … without a year. I'm assuming that would be last year, but I do not have that."

The trial court responded, "We can't assume that," and gave the prosecutor a chance to respond. The prosecutor objected based on foundation. The prosecutor also asserted, "As to the relevance of these photographs, they appear to be pictures of Williams … holding two different firearms. The fact that he holds firearms and posts on Facebook … I know the relevance is that he's had firearms in the past, but we have no evidence that … Aaron … or [defendant] ever seen [sic] these, what the particular relevance would have been and how it goes to self-defense in this case. I'm struggling to figure that aspect out."

Defense counsel responded that he would like to speak to Leesa "about it." He stated Leesa had "given inconsistent stories to 9-1-1, to interviewing officers, and in the preliminary hearing." He asserted "there is still some relevance if she indicates that she's never seen [Williams] to either be physically aggressive, or to either obtain or have weapons. I don't want to give too much defense strategy away, but for the sake of this

9.

motion, there could have been evidence that was moved, and if it was, it could have been [Leesa]. And I would like to ask her what she knows about [Williams] having firearms."

The trial court found that, "[a]s of right now there is no foundation. Maybe some questioning by [Leesa] may give you a little more ground to stand on, but as of right now, there is no indication as to when these photos were taken." The court then asked if anybody was "stating that these were taken in the room in which he was killed?" Defense counsel responded that he did "not believe that is the claim." The court explained that if that was the claim, "there might be a little more relevance, but as of right now, the Court is going to find that there is a lack of foundation."

**Standard of Review and Relevant Law**

Authentication of a photograph is required before it may be admitted into evidence. (Evid. Code, §§ 250, 1401; *People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "Authentication is to be determined by the trial court as a preliminary fact ([Evid. Code,] § 403, subd. (a)(3)) and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' ([Evid. Code,] § 1400). The statutory definition ties authentication to relevance." (*Goldsmith*, at p. 266.) "A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who witnessed the event being recorded. [Citations.] It may be supplied by other witness testimony, circumstantial evidence, content and location. [Citations.] Authentication also may be established 'by any other means provided by law' ([Evid. Code,] § 1400), including a statutory presumption." (*Goldsmith*, at pp. 267–268.) "[T]he proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error. [Citation.] The first step is to determine the purpose for

10.

which the evidence is being offered.  The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case.  [Citation.]  The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered.  [Citation.]  Essentially, what is necessary is a prima facie case.  'As long as the evidence would support a finding of authenticity, the writing is admissible.  The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*Id*. at p. 267.)  We review the trial court's rulings on the admissibility of evidence for abuse of discretion.  (*Id.* at p. 266; *People v. Lee* (2011) 51 Cal.4th 620, 643.)  Evidence is relevant if it has any tendency in reason to prove a disputed material fact.  (Evid. Code, § 210; *People v. Waidla* (2000) 22 Cal.4th 690, 718.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

" 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense.  Courts retain … a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.)  "It follows, for the most part, … the mere erroneous exercise of discretion under such 'normal' rules does not implicate the federal Constitution." (*Ibid*.)  Accordingly, when defense evidence is erroneously excluded, the applicable standard of prejudice is generally that for state law error, as set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (See *Cudjo*, at p. 611.)

Section 1103 of the Evidence Code provides:

"(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evid. Code,] [s]ection 1101 if the evidence is:

"(1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.

"(2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

**Analysis**

Defendant claims the trial court erred when it excluded photographs of Williams holding a firearm. He asserts such evidence was relevant and admissible under Evidence Code section 1103 to support a finding defendant acted in self-defense and to impeach Leesa P.'s version of events. He argues it did not matter when the pictures were taken or whether defendant knew of them because the pictures supported a relevant inference that Williams had a character for possessing guns and acting threateningly and he acted in conformity with that character during the charged incident. He argues, such character evidence could be relevant to support a finding of self-defense, even if defendant did not know about the photographs. He contends the referenced photographs were also not inadmissible pursuant to Evidence Code section 352, nor did the court exclude them on that basis. He argues the court applied an incorrect legal standard to the extent it held that the relevance of the photographs "depended on a showing of the preliminary fact that the photographs were either (1) taken at a certain defined time or (2) taken in the room where the charged incident happened," because the photographs were still relevant under Evidence Code section 1103. Defendant asserts his "counsel made the 'substance, purpose, and relevance' of the photos at issue known to the trial court, such that this claim of erroneous exclusion of evidence is cognizable under Evidence Code section 354." He asserts it was unnecessary for defense counsel to make any further argument regarding the admissibility of these photographs, but if counsel failed to

12.

preserve any of defendant's claims with regard to the photographs, he contends his counsel was constitutionally ineffective. The People argue defendant forfeited his claim that the court erroneously excluded the two photographs of Williams because defendant did not seek to admit the photographs. Rather, before Leesa's testimony, defense counsel stated that he would try to lay a foundation for the photographs and "may request" the court allow him to introduce the photographs. And, the People contend, "the trial court did not definitively rule that the photographs were not admissible." They further contend defense counsel was not ineffective in failing to seek admission of such evidence nor was defendant prejudiced. We cannot conclude the court abused its discretion.

Here, as the People note, defense counsel did not move to admit the photographs referenced. Rather, defense counsel merely marked the photographs for identification and indicated he intended to try to lay a foundation for their admission through the testimony of Leesa P. However, such evidence was never revisited in the record.

But, even if we were to conclude the issue was sufficiently preserved for our consideration, we cannot conclude the trial court abused its broad discretion in concluding the photographs lacked foundation and were inadmissible on that basis. No evidence was introduced regarding the authenticity of the photographs. Indeed, counsel acknowledged the lack of such a foundation and indicated his intention to provide such a foundation through the testimony of Leesa. However, no subsequent discussion of the photographs appears in the record. Nor can we conclude, as defendant asserts, that the photographs were self-authenticating. (See Evid. Code, § 1421; see also *People v. Beckley* (2010) 185 Cal.App.4th 509, 515 [court erred in admitting photograph downloaded from a social media site where record did not contain any "evidence sufficient to sustain a finding that it is the photograph that the prosecution claims it is, namely, an accurate depiction of [the defendant's girlfriend] actually flashing a gang sign."]; cf. *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1436 [concluding trial court did not err in admitting pages from the defendant's social media page that included his

13.

gang moniker, a photograph of him making a gang hand signal, and written notations where evidence was introduced "of the password requirement for posting and deleting content," distinguishing the case from *Beckley*, "as does the pervasive consistency of the content of the page, filled with personal photographs, communications, and other details tending together to identify and show owner-management of a page devoted to gang-related interests."]; *In re K.B.* (2015) 238 Cal.App.4th 989, 997 [incriminating photographs taken from a cellular phone that also appeared on a social media site were properly authenticated where investigating officers provided a foundation for them]; see generally *Beckley*, at pp. 515–516 ["digital photographs can be changed to produce false images" and " '[a]nyone can put anything on the Internet. No web-site is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation.' "].) Thus, the court's conclusion defendant had failed to lay a sufficient foundation for the photographs of Williams was not erroneous.

Defendant also contends the trial court erred to the extent it considered when and where the photographs were taken in considering their relevance. He argues evidence of specific incidents of a victim's relevant character trait under Evidence Code section 1103 does not depend on when the specific instance occurred. But, as defendant acknowledges, his counsel did not expressly argue the photographs of Williams holding firearms were admissible under Evidence Code section 1103. Rather, defense counsel did not expressly indicate the probative value of such evidence nor the basis for the admission of the photographs. And we cannot conclude the court erred to the extent it considered the lack of relevance of such evidence. Based on defense counsel's comments, the court could have reasonably understood that defense counsel was seeking admission of such evidence to establish Williams had a gun at or near the time of the incident. Accordingly, the court did not abuse its discretion in questioning when the

14.

photographs were taken in considering their relevance. Rather, we find no abuse of discretion.

We also cannot conclude defendant has established his counsel provided ineffective assistance by failing to pursue the admission of such evidence further. A defendant claiming ineffective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.) In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance …." (*Id*. at p. 689; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption the challenged action might be considered sound trial strategy under the circumstances. (*Strickland*, at p. 689; *Dennis*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.) On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

It is settled that, "[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211, citing *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) And here, counsel was not asked for an explanation as to why he did not attempt to lay a foundation for the referenced evidence or subsequently seek its admission on any grounds, including pursuant to Evidence Code section 1103. And we

15.

cannot conclude there could be no satisfactory explanation for counsel's failure to do so. Rather, counsel could have reasonably concluded that Leesa P.'s testimony would not alter the trial court's prior conclusion or that the photographs would not otherwise have been admissible. Counsel could have also made a tactical decision not to seek to introduce such evidence to establish Williams was a violent person so as not to open the door to character evidence as to defendant. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 696 ["if … a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that … the defendant was a violent person, from which the jury might infer it was the defendant who acted violently."].) Counsel could have also reasonably concluded evidence of Williams holding guns in the past was not relevant to the defense as no witnesses testified Williams had a gun during the incident, no weapons were recovered from the room, and defendant did not claim Williams threatened him with imminent harm or that he shot Williams in self-defense. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 828 ["Where no evidence is presented that the victim posed a threat to the defendant, exclusion of evidence regarding the victim's propensity for violence is proper."].) Rather, defendant told the police he was not present during the shooting. Accordingly, defendant has not overcome the presumption defense counsel acted within "the wide range of reasonable professional assistance .…" (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689; accord, *People v. Dennis*, *supra*, 17 Cal.4th at p. 541.)

Additionally, defendant has not established a reasonable probability that, but for counsel's failure to pursue admission of such evidence, pursuant to Evidence Code section 1103 or otherwise, the result of the proceeding would have been different. Rather, for the reasons stated, we cannot conclude the trial court would have necessarily admitted such evidence or that there is a reasonable probability the photographs would have changed the result of the proceeding even if they had been admitted pursuant to

Evidence Code section 1103 as evidence of Williams's character trait for violence. The evidence implicating defendant was strong. Gayer expressly identified defendant as the person with the gun and defendant himself admitted being at the scene of the crime on the day of the shooting and confronting Williams. And the relevance and probative value of the photographs of Williams was minimal as there was limited, if any, evidence Williams was armed at the time of the offense, threatened defendant with imminent harm, or that defendant acted in self-defense. There was also extensive evidence, including Gayer's and Shanda's testimony, regarding Williams's threats leading up to the shooting, as well as his behavior towards them which they deemed threatening. In addition, testimony regarding Williams's alleged gang association was admitted. Furthermore, as discussed, defendant did not rely on a theory of self-defense at trial. Accordingly, there is no reasonable probability defendant would have obtained a more favorable outcome had he been permitted to introduce the photographs of Williams holding guns. (See *People v. Gutierrez*, *supra*, 45 Cal.4th at p. 828 [no reasonable probability defendant would have obtained a more favorable result if evidence of victim's prior misdemeanor battery conviction had been admitted where defendant was permitted to testify regarding his past fights with the victim, the tumultuous nature of their relationship, and the details of the altercation that occurred the day the victim was killed].) Thus, we reject his ineffective assistance of trial counsel claim.

We reject defendant's first contention.

### Trial Court Did Not Prejudicially Err In Failing to Instruct Jury, Sua Sponte, With CALCRIM No. 3475

Defendant next asserts the trial court prejudicially erred by failing to instruct on the right to use reasonable force to eject a trespasser, pursuant to CALCRIM No. 3475, in violation of defendant's federal constitutional rights. We disagree.

17.

**Standard of Review**

" ' "A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' " ' [Citation.] A trial court also ' " has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on …, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' [Citation.] Yet when ' "instructions relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case … ," ' such instructions ' "are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte." ' [Citation.] More generally, '[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.' " (*People v. Aguirre* (2025) 18 Cal.5th 629, 677–678.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

**Applicable Law**

CALCRIM No. 3475, which is an instruction that discusses the right to eject a trespasser from real property, provides:

> "The (owner/lawful occupant) of a (home/property) may request that a trespasser leave the (home/property). If the trespasser does not leave within a reasonable time and it would appear to a reasonable person that the trespasser poses a threat to (the (home/property)/ [or] the (owner/ [or] occupants), the (owner/lawful occupant) may use reasonable force to make the trespasser leave.
>
> "*Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to make the trespasser leave.

"[If the trespasser resists, the (owner/lawful occupant) may increase the amount of force he or she uses in proportion to the force used by the trespasser and the threat the trespasser poses to the property.]

"When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The People have the burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable.  If the People have not met this burden, you must find the defendant not guilty of *<insert crime>*."

"The principles set forth in CALCRIM No. 3475 … apply primarily to cases in which the *owner or occupant* of property is charged with using excessive force to remove a trespasser." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 709.)

**Analysis**

Defendant argues that Gayer had the right to use reasonable force to eject Williams from the property and the right also extended to others who Gayer, the owner/occupant, enlisted to help, citing Penal Code sections 692, 693, and 694.  The People respond the trial court did not err in failing to give this instruction because it was not supported by substantial evidence.  They contend there was no evidence Williams physically resisted or that defendant used less than deadly force to remove Williams.  Rather, defendant shot Williams in the head and "the intentional use of deadly force merely to protect property is never reasonable," citing *People v. Curtis* (1994) 40 Cal.App.4th 1337.

Defendant concedes his counsel did not request CALCRIM No. 3475 and we cannot conclude counsel was ineffective in this regard, or that the instruction was otherwise supported.

Initially, it has been held that "a homicide involving the *intentional* use of deadly force can never be justified by defense of habitation alone.  The defendant must also show either self-defense or defense of others, i.e., that he or she reasonably believed the intruder intended to kill or inflict serious injury on someone in the home." (*People v.*

19.

*Curtis*, *supra*, 30 Cal.App.4th at p. 1360.) And, here, there was no dispute that the shooting of the firearm that killed Williams was intentional. And there was not substantial evidence to show defendant used "reasonable force" in this case to eject Williams from the property. Defendant shot Williams in the head. Because "the intentional use of deadly force merely to protect property is never reasonable" (*Curtis*, at p. 1360), defendant had to show either self-defense or defense of others to justify the killing, which the jury was properly instructed on.

Irrespective, we conclude any alleged error in failing to request this instruction or in the trial court's failure to instruct the jury, sua sponte, with CALCRIM No. 3475 was harmless. Here, the court instructed the jury on defendant's right to defend himself pursuant to self-defense and imperfect self-defense. Such instructions were sufficient to guide the jury's determination of whether defendant's actions were justified or otherwise defensible. (See *People v Johnson*, *supra*, 180 Cal.App.4th at p. 710 ["The trial court's instructions sufficiently informed the jury that defendant had the right to defend himself in the appropriate circumstances, and were adequate to guide the jury's determination of whether defendant acted in reasonable self-defense. Absent some affirmative indication otherwise, we presume the jurors understood and followed the trial court's instructions."].) Thus, it is not reasonably probable the result of the proceeding would have been more favorable to defendant if CALCRIM No. 3475 had been given. Furthermore, defendant's contention the alleged error resulted in a violation of his constitutional rights is unfounded. (See *People v. Dickey* (2005) 35 Cal.4th 884, 905 ["Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution."].)

**Cumulative Error**

Defendant next argues the cumulation of the aforementioned two errors in this case prejudiced him. " 'However, we either have rejected his claims and/or found any

20.

assumed error to be nonprejudicial on an individual basis.  Viewed as a whole, such errors do not warrant reversal of the judgment.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1026; see *People v. Stitely* (2005) 35 Cal.4th 514, 560.)  Thus, we reject this contention.

### Remand for a New Restitution Hearing is Necessary

Defendant next asserts the restitution order requiring him to pay $5,439.79 to the California Victim Compensation Board must be reversed.  He asserts restitution for expenses paid by the Board requires proof established by copies of bills submitted to the Board, reflecting the amount paid, pursuant to section 1202.4, subdivision (f)(4)(B).  The People agree with this contention.

### Relevant Factual Background

During the sentencing hearing, the People asked, as to both defendants, for a restitution fine in the amount of $5,439.79.  The prosecutor stated he was "[p]roviding the Court with the California Victim Compensation Board forms" and submitted.  The trial court stated, "the restitution amount specifically are [*sic*] for funeral expenses for the victim in this case, [Williams], in the amount of $5,439.79, this is pertaining to California Victim Compensation Board application number A21-8362766."  The probation report recommended $5,439.79 in restitution to the Board for funeral expenses.  The probation report also included a "Restitution Request" from the Board requesting restitution in this amount.  At sentencing, the court gave defense counsel an opportunity to be heard regarding the amount and restitution.  Counsel for Aaron objected to the restitution amount and asked for a formal hearing.  He asserted, "If the Court is just inclined to just accept the document, I would object to that acceptance as lacking foundation, being hearsay and lacking proper authentication, submitted."  The prosecutor agreed to a hearing and explained the People's intent "just to submit the California Victim Compensation form," which it had already submitted.

The trial court proceeded with a formal hearing and confirmed that the prosecutor was "submitting on the restitution request that is documented in the California Victim Compensation Board documentation." Counsel for Aaron reiterated his previous objections, asserting lack of foundation, hearsay, and lacking authentication. Defendant's counsel joined in the objections and the parties submitted. The court overruled the objections and stated it was "satisfied with the representation from the California Victim Compensation Board," and "[t]he amount in question of $5,439.79 is not out of line." The court stated, "[t]here is no reason for anyone to pad the request. The Court finds that under the circumstances, that this particular organization, state organization, has a duty and there is a presumption that when they present information like this, that it is indeed correct. I have not received any type of evidence to overcome that presumption and the Court is going to overrule the objection and find that the amount requested of $5,439.79 is reasonable and will be ordered to be paid by both [defendant] and Aaron …, and that will be joint and several liability." The court explained to defendant and Aaron "that means … you are both responsible. It does not mean that you each have to pay $5,439.79. It means that combined whether it's … Aaron … that pays the full amount or [defendant] that pays the full amount, you are both responsible to make California Victim Compensation Board whole in the total amount of $5,439.79."

**Applicable Law**

In California, crime victims have the right to receive restitution for losses attributable to the defendant's actions. (Cal. Const., art. I, § 28, subd. (b)(13)(B); § 1202.4, subd. (a)(1).) Indeed, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (§ 1202.4, subd. (f).) " ' "Section 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as

22.

prima facie evidence of loss, may accept a property owner's statement made in the probation report about the value of stolen or damaged property." [Citations.] " 'This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.] When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount.' " ' " (*People v. Lockwood* (2013) 214 Cal.App.4th 91, 96, quoting *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1320.)

However, "section 1202.4, subdivision (f)(4) includes special provisions" that are applicable when, as here, "state funds are used to provide assistance to or on behalf of a victim." (*People v. Lockwood*, *supra*, 214 Cal.App.4th at p. 96.) Section 1202.4, subdivision (f)(4)(B) provides: "The amount of assistance provided by the Restitution Fund shall be established by copies of bills submitted to the California Victim Compensation Board reflecting the amount paid by the board and whether the services for which payment was made were for medical or dental expenses, funeral or burial expenses, mental health counseling, wage or support losses, or rehabilitation. Certified copies of these bills provided by the board and redacted to protect the privacy and safety of the victim or any legal privilege, together with a statement made under penalty of perjury by the custodian of records that those bills were submitted to and were paid by the board, shall be sufficient to meet this requirement."

**Analysis**

Defendant contends substantial evidence does not support the trial court's restitution order which, he asserts, is unauthorized under section 1202.4, subdivision (f)(4)(B). The People agree with defendant's contention. They note they only presented a request for restitution from the Board based on its payment of $5,439.79 for funeral expenses, but the request did not include certified copies of bills to support the request as required by section 1202.4, subdivision (f)(4)(B). Thus, they agree the

23.

restitution order failed to comply with section 1202.4, subdivision (f)(4)(B) and was not supported by substantial evidence. The parties agree remand for a new restitution hearing is required at which the People can present evidence.

Here, it is undisputed the prosecution submitted neither certified copies of bills submitted to the California Victim Compensation Board nor any declaration signed under penalty of perjury by any custodian of records showing the Board paid the bills as required by section 1202.4, subdivision (f)(4)(B). Thus, the section 1202.4, subdivision (f)(4)(B) restitution order lacks the necessary evidentiary support and must be vacated and the case remanded for a new restitution hearing.

**Abstract of Judgment Must Be Modified**

Defendant next asserts the abstract of judgment must be corrected to reflect he was sentenced to a term of 40 years to life. The People agree. We, too, agree.

The abstract of judgment states defendant was sentenced to a term of 50 years to life on count 1. It also reflects defendant was sentenced to 25 years on the section 12022.53, subdivision (d) enhancement. However, defendant was sentenced to 15 years to life on count 1 and 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.

"When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

Accordingly, following the restitution hearing on remand, the trial court is instructed to prepare a corrected abstract of judgment that reflects defendant's total sentence of 40 years to life, comprised of a sentence of 15 years to life on count 1 and 25 years to life for the section 12022.53, subdivision (d) enhancement.

**DISPOSITION**

The order for $5,439.79 in restitution to the California Victim Compensation Board is vacated and the matter is remanded to the trial court to hold a new restitution hearing. Following the restitution hearing, the court is ordered to modify the abstract of judgment to reflect defendant was sentenced to a term of 15 years to life on count 1 and 25 years to life for the section 12022.53, subdivision (d) firearm enhancement and to reflect changes, if any, to the restitution amount pursuant to section 1202.4, subdivision (f)(4)(B). The court shall forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

DESANTOS, J.

25.